## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 31 2018, 9:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Sean P. Hilgendorf
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Demarquis D. Rice,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 31, 2018

Court of Appeals Case No.
18A-CR-763

Appeal from the
St. Joseph Superior Court

The Honorable
John M. Marnocha, Judge

Trial Court Cause No.
71D02-1701-F4-2

**Kirsch, Judge.**

[1] Demarquis D. Rice ("Rice") was convicted after a jury trial of burglary[1] as a Level 4 felony and resisting law enforcement[2] as a Class A misdemeanor. He appeals his conviction for Level 4 felony burglary contending that the State failed to present sufficient evidence to support the conviction.

[2] We affirm.

## Facts and Procedural History

[3] On January 10, 2017, Officer Sienna Sears ("Officer Sears") of the South Bend Police Department was working the midnight shift, when she was dispatched to Echo Drive at around 3:00 a.m. on a call reporting a suspicious person in the area. *Tr. Vol. 2* at 44. Officer Michael Stuk ("Officer Stuk") was also working the midnight patrol on the same night and was also dispatched to Echo Drive. *Id.* at 56. It had been snowing that night, but the snow had stopped just prior to the officers arriving to the call. *Id.* at 44, 56. When they arrived, the officers observed footprints in the snow, and they followed the footprints, which were easy to see in the fresh snow. *Id.* at 45, 56-57.

[4] As he followed the footprints, Officer Stuk came across a black object, which turned out to be a GPS device. *Id.* at 58. The trail of footprints eventually led Officer Sears to Woldhaven Drive where she observed two men carrying lawn equipment and walking through someone's front yard. *Id.* at 46. Because the

---

[1] *See* Ind. Code § 35-43-2-1.

[2] *See* Ind. Code § 35-44.1-3-1(a)(3).

call from dispatch had reported that people were breaking into vehicles, Officer Sears exited her patrol car, which was marked, identified herself as a police officer, and ordered the men to stop. *Id.* The men did not stop, but instead, dropped the lawn equipment and ran eastbound on foot. *Id.* at 46-47. The lawn equipment included two leaf blowers.

[5] When the men began to run, Officer Sears contacted Officer Stuk and informed him that she was trying to stop the two men. *Id.* at 60. Officer Sears and Officer Stuk followed the footprints the men left behind when they ran through yards and over fences as they fled. *Id.* at 47. The tracks eventually led the officers to a parked van where they discovered a cluster of footprints. *Id.* at 49. After a backup unit arrived to assist, Officers Stuk and Sears ordered the occupants of the van to exit. *Id.* at 49, 61. Rice was identified as one of the three men in the van. *Id.* at 49. Officer Sears spoke with Rice and first read him his Miranda warnings. *Id.* at 51. After she read Rice his rights and informed him that he had the right not to speak with her, Rice stated that he understood his rights and then admitted that he was one of the two men who ran from the police earlier. *Id.*

[6] Officer Stuk also photographed the men and the treads of their shoes in order to confirm which of the three men had been seen earlier dropping the lawn equipment and running from Officer Sears. *Id.* at 61; *State's Exs.* 18-26. Each of the three men wore shoes with a different and distinct tread pattern. *Tr. Vol. 2* at 63-64. Officer Stuk then went back to the location where Officer Sears had originally seen the suspects and where the property was located. *Id.* at 65-66.

There, he photographed the footprints located near the discarded lawn equipment. *Id*. at 66. One set of the footprints in the snow matched Rice's footwear, which had a distinctive herringbone pattern. *Id*. at 67-68; *State's Exs.* 24-25. The other set was consistent with Nike Air footwear, which was worn by one of the van's other passengers. *Tr. Vol. 2* at 67; *State's Ex.* 23. The footprints in the path left by Rice led Officer Stuk from the intersection where the police discovered the lawn equipment to an open garage door at a home owned by Charles Dance ("Dance"). *Tr. Vol. 2* at 69. At that time, Officer Stuk noticed that it appeared that the garage door had not been open for long due to the fact that there was no snow inside the garage. *Id.* at 69. Officer Stuk knocked on Dance's door.

[7] Dance had been living at his home in St. Joseph County for thirty-eight years. He owned the home and lived there with his wife. Dance was in his home in the early morning hours of January 10, 2017 and had been sleeping on a couch in the breezeway of the home instead of the master bedroom because he was suffering from a case of walking pneumonia. *Id*. at 23. He had awakened because of a bad coughing fit at about 3:00 a.m. and had gone to the kitchen for some water, then returned to sleep at about 3:10 a.m. *Id*. Around that time, Dance heard some rumbling noises in his garage. *Id*. at 24.

[8] At around 3:20 a.m., Dance heard heavy pounding on his front door, and when he looked outside, he saw Officer Stuk and another officer, who had followed the footprints leading from the lawn equipment back to his open garage door. *Id*. at 24, 69. Dance opened the door and spoke with the officers, who informed

him that his garage door was open. *Id*. at 24-25. The officers then requested that Dance go through the interior of his house to his garage to avoid disrupting the snow and identify some stolen property. *Id*. at 25.

[9] Dance and his wife owned two vehicles, a 2016 Ford Escape which was parked inside the garage, and a 2004 Ford Taurus, which was parked in the driveway. When Dance entered his garage, he noticed that the door to the Ford Escape was open about two inches. Dance had closed his garage door earlier that night; however, it was open at the time the officers arrived at his house. *Id*. at 26. When Dance attempted to close the garage door later, he had to do so manually because it had been disengaged. *Id*. at 27. He was also unable to use the bolt latch that he slides into a slot in the garage door's track because it had been misaligned. *Id*. at 27-28, 33-35. Dance eventually had to hire a repairman to realign the track with the slide lock. *Id*. at 32. The police recovered three items that had been taken from Dance's garage and returned them to Dance. The stolen items included the two leaf blowers, a Craftsman gas-powered leaf blower and a Craftsman electric-powered leaf blower, and a black Garmin GPS device, which Dance normally kept in the back seat of the Ford Escape. *Id*. at 28-29.

[10] The police arrested all three men who had been found in the van, including Rice. The State charged Rice with Level 4 felony burglary and Class A misdemeanor resisting law enforcement. A jury trial was held on January 29 and 30, 2018, and at the conclusion of the trial, the jury found Rice guilty as charged. Rice now appeals his conviction for Level 4 felony burglary.

# Discussion and Decision

[11]    Rice argues that insufficient evidence was presented to support his conviction. The deferential standard of review for sufficiency claims is well settled. When we review the sufficiency of evidence to support a conviction, we do not reweigh the evidence or assess the credibility of the witnesses. *Boggs v. State,* 928 N.E.2d 855, 864 (Ind. Ct. App. 2010), *trans. denied.* We consider only the evidence most favorable to the verdict and the reasonable inferences that can be drawn from this evidence. *Fuentes v. State,* 10 N.E.3d 68, 75 (Ind. Ct. App. 2014), *trans. denied.* We also consider conflicting evidence in the light most favorable to the trial court's ruling. *Oster v. State,* 992 N.E.2d 871, 875 (Ind. Ct. App. 2013), *trans. denied.* We will not disturb the jury's verdict if there is substantial evidence of probative value to support it. *Fuentes,* 10 N.E.3d at 75. We will affirm unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Delagrange v. State*, 5 N.E.3d 354, 356 (Ind. 2014). As the reviewing court, we respect "the jury's exclusive province to weigh conflicting evidence." *McHenry v. State,* 820 N.E.2d 124, 126 (Ind. 2005). A conviction may be sustained based on circumstantial evidence. *Baltimore v. State*, 878 N.E.2d 253, 258 (Ind. Ct. App. 2007), *trans. denied*. Circumstantial evidence need not exclude every reasonable hypothesis of innocence; rather, circumstantial evidence can sustain a conviction if an inference may reasonably be drawn from the evidence to support the judgment. *Id.*

[12]    Rice contends that the State failed to present sufficient evidence to support his conviction for Level 4 felony burglary. He specifically claims that the evidence

did not sufficiently prove that he was the person "who broke and entered Dance's garage nor that he aided, induced, or caused another person to do so." *Appellant's Br*. at 7. Rice maintains that the evidence was only sufficient to possibly create an inference that he may have been exerting unauthorized control over Dance's property, but failed to prove beyond a reasonable doubt that he, or anyone else he was with, broke and entered Dance's garage. Rice also argues that there was not sufficient evidence presented to prove that any physical act was used to gain entry to Dance's garage. Rice asserts that the evidence showed that Dance only thought that he closed the garage door earlier that night and that there was no evidence that the garage door had been tampered with in any way, which left the jury to speculate as to whether the garage door "was ever really closed." *Id*. at 8.

[13] In order to convict Rice of Level 4 felony burglary, the State was required to prove beyond a reasonable doubt that he broke and entered the dwelling of Dance with the intent to commit a theft therein. Ind. Code § 35-43-2-1(1). "Using even the slightest force to gain unauthorized entry, which can include opening an unlocked door or pushing a door that is slightly ajar, satisfies the breaking element of the crime." *Wilson v. State*, 94 N.E.3d 312, 323 (Ind. Ct. App. 2018) (citing *Davis v. State*, 770 N.E.2d 319, 322 (Ind. 2002)), *trans. denied*. Circumstantial evidence alone can prove the occurrence of a breaking. *Id*. (citing *Payne v. State*, 777 N.E.2d 63, 66 (Ind. Ct. App. 2002)).

[14] Here, the evidence most favorable to the verdict showed that, after being dispatched on a report of suspicious individuals in the area, Officer Sears

observed two men, one of whom was later identified as Rice, walking and carrying two leaf blowers. It was approximately 3:00 a.m. in January, and it had recently been snowing. When Officer Sears told the individuals to stop, they dropped the leaf blowers and ran away. Because of the fresh snow on the ground, Officer Sears and Officer Stuk were able to follow the footprints of Rice and the other man to a van. *Tr. Vol. 2* at 47, 49. After reading the men their Miranda rights, Rice admitted that he was one of the men that Officer Sears had seen carrying the leaf blowers and running away. *Id*. at 51. Pictures were taken of each man, their shoes, and the treads on the shoes. One set of the footprints in the snow near the abandoned leaf blowers matched Rice's footwear, which had a distinctive herringbone pattern. *Id*. at 67-68; *State's Exs.* 24-25. Officer Stuk followed the footprints from their origin, which led from the intersection where the leaf blowers were discovered to an open garage door at Dance's home. *Tr. Vol. 2* at 69. At that time, Officer Stuk noticed that it appeared that the garage door had not been open for a long period of time because there was no snow inside the garage, and it had just stopped snowing. *Id*.

[15] Dance testified that he had awakened around 3:00 a.m. because of a bad coughing fit and had heard some rumbling noises in his garage. The officers knocked on Dance's door around 3:20 a.m. and asked him to go out to his garage. When Dance entered his garage, he noticed that the door to his Ford Escape was open about two inches. Dance testified that he had closed his garage door earlier that night; however, it was open at the time the officers

arrived at his house. *Id.* at 26. Later, when Dance attempted to close the garage door, he had to do so manually because it had been disengaged. *Id.* at 27. He was also unable to use the bolt latch that he slides into a slot in the garage door's track because it had been misaligned. *Id.* at 27-28, 33-35. Dance was able to identify the items stolen from his garage as two leaf blowers, and a black Garmin GPS device, which Dance normally kept in the back seat of the Ford Escape. *Id.* at 28-29. This evidence was sufficient to prove that Rice broke and entered Dance's garage with the intent to commit theft.

[16] Rice's arguments to the contrary are merely requests for this court to reweigh the evidence and judge the credibility of the witnesses, which we cannot do. *Boggs,* 928 N.E.2d at 864. Rice asserts that sufficient evidence was not presented to prove that there was an illegal break into Dance's garage. He claims that Dance only testified that he thought that he had closed his garage door and never indicated that he heard anyone break into his garage or that there was any evidence that the garage door had been tampered with in any way. We do not agree. At trial, Dance testified that the garage door had been closed when he left it earlier in the night, but it was open when the police later came to his home at 3:20 in the morning. *Tr. Vol. 2* at 26. Dance also testified that when he awoke from a coughing fit at about 3:00 a.m., he heard rumbling noises from the garage. *Id.* at 24. He further testified that when he later attempted to close the garage door, he had to do so manually because it had been disengaged and that he was unable to use the bolt latch on the garage door because it had been misaligned. *Id.* at 27-28, 33-35. Further, the evidence

showed that it had been snowing that night and only recently stopped around the time that the officers had been called to the area, and Officer Stuk testified that when he arrived at Dance's home, there was no snow inside of the garage.

[17] Rice also contends that there was not sufficient evidence to prove that he was the person who broken and entered into Dance's garage. However, the evidence showed that Rice's distinctive footprints were found at the location where the leaf blowers were dropped, and Officer Stuk followed those footprints from that location to the open garage door at Dance's home. Rice admitted that he was one of the men that dropped the leaf blowers and ran away from Officer Sears when she ordered them to stop. Therefore, a jury could reasonably infer that Rice was one of the individuals who broke and entered into Dance's garage and stole the missing items. Sufficient evidence was presented to support Rice's conviction for Level 4 felony burglary.

[18] Affirmed.

[19] Vaidik, C.J., and Riley, J., concur.